OPINION
Defendant-appellant, Anthony Moubray, appeals a decision of the Brown County Court of Common Pleas granting plaintiff-appellee, Linda Moubray, a divorce and dividing the parties' real and personal property and the debts of the marriage.
The parties were married on May 23, 1981. From the date of their marriage until Linda filed for divorce, the parties resided together at 3849 Upper Five Mile West, Mt. Orab located in Brown County, Ohio (the "marital home"). During the course of the marriage, the parties had three children, Brian Moubray, born May 19, 1982; Shannon Moubray, born June 16, 1985; and Michael Moubray, born January 12, 1989.
On May 26, 1995, Linda filed a complaint for divorce alleging mutual incompatibility and that Anthony was guilty of gross neglect of duty. The trial court issued temporary orders requiring Anthony to vacate the marital premises, restraining Anthony from harassing Linda, preventing either party from accessing a joint savings account, naming Linda temporary legal custodian and residential parent of the parties' three minor children, and requiring Anthony to pay child support. On June 2, 1995, Anthony filed an answer denying any gross neglect of duty or incompatibility, requesting dismissal of the divorce action, and seeking temporary custody of the parties' three minor children.
On October 30, 1996, a hearing was held before a magistrate at which testimony was presented by Linda, Anthony and Anthony's father. Before the hearing began, both parties agreed that: Linda should remain as the legal custodian and residential parent of the parties' three minor children; Anthony should continue to have guideline visitation with the children; the divorce should be granted on the grounds of mutual incompatibility; and the marital home should be sold. The remaining relevant issues to be decided by the magistrate dealt with the division of the parties' property and debts.
Linda testified that she is a laboratory supervisor at the Fairfield Water and Waste Water Divisions and her salary in 1995 was $39,890. Throughout the marriage, Linda testified that she and Anthony maintained separate charge cards, savings and checking accounts.[1] Linda testified that they established a joint account, the National Bank Trust account, for funds that the couple considered to be marital such as their income tax refunds and the money from the mortgages for the home. Linda further testified that during the marriage, she paid from her separate accounts certain bills each month: groceries, expenses associated with the house and children, day care, her transportation expenses, car payments, and all personal bills accumulated by her and the children. Linda stated that Anthony paid from his separate accounts each month: water, electric, telephone, garbage, his transportation expenses, the expenses associated with his hobby of raising standard bred horses and any personal bills accumulated by him.
Anthony testified that he is an aircraft mechanic with Airborne Express. His salary for 1995 was $31,400. Anthony testified that he expended $22,470.45 of his own money prior to the marriage on the marital home. Anthony made a $3,999 down payment on the real estate, executed an $11,000 mortgage with his parents to pay off the remaining $10,936.25 on the land contract for the real estate, made improvements to the land (driveway, septic tank, fences, electrical service), and purchased a mobile home for $2,750.
Anthony and Linda obtained a bank loan on August 20, 1983 to build a home on the property. When the home was completed in 1985, Anthony sold his mobile home for $2,000 and put the proceeds into the joint account. On May 12, 1988, and on May 7, 1994, the parties took out two additional loans on the property. Anthony and Linda's names were on all three mortgages. Linda testified that since 1983, both parties paid one-half of the mortgage until June 1995, when the court issued a temporary order requiring Linda to pay three-fourths of the mortgage and Anthony one-fourth of the mortgage during the divorce proceedings.
Prior to the divorce being filed, Linda testified that she gave her mother $17,000 from her Hambuco Credit Union account to reimburse her for college expenses and to purchase a heating and air condition system. Linda further testified that she used additional funds from her accounts to pay for expenses during the divorce proceedings.
On August 10, 1995, Anthony's parents, Thomas and Gladys Moubray, filed a complaint in the Brown County Court of Common Pleas, alleging that they had not been repaid for a $10,936.25[2] loan they made to Anthony on July 25, 1980, to purchase real estate which became the marital home, and for a $9,000 loan they made to Anthony and Linda for household and living expenses while Anthony attended an eighteen month training program in 1991 and 1992.
On June 5, 1997, the magistrate requested that the parties file proposed findings of facts and conclusions of law. In July 1997, both parties filed their proposed findings of fact and conclusions of law. On Sept 25, 1997, the magistrate filed a report recommending that the parties be granted a divorce from each other and made findings of fact as to parental rights and responsibilities, property division and marital debts. On October 2, 1997, Anthony filed objections to the magistrate's report and findings of fact and conclusions of law. Anthony contended, interalia, that the magistrate erred by finding that Linda was entitled to her funds from the Hambuco and Star Bank accounts, that Anthony had no premarital interest in the real estate, and that Anthony was responsible for the $19,936.25 debt to his parents.
On Oct 21, 1997, Linda filed a response to Anthony's objections. On August 27, 1998, the trial court filed a judgment entry adopting the magistrate's report and findings subject to specific modifications stated therein. In an April 1, 1999 decree of divorce, the trial court divided the parties' assets and debts.
As part of the trial court's division of property, the parties were awarded the proceeds from their respective individual accounts, Anthony was awarded $4,952.15 in premarital interest, and Anthony's share of the proceeds from the sale of the marital home was subject to the judgment lien of $19,936.25 against the property. Anthony timely appeals this decision presenting three assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN REFUSING TO CONSIDER SAVINGS ACCOUNTS WHICH ACCRUED DURING THE TIME OF THE MARRIAGE AS MARITAL PROPERTY.
In his first assignment of error, Anthony argues that the trial court ignored the existence of funds accrued during the marriage from the earnings of the parties in its property distribution. Specifically, Anthony argues that he was entitled to half of the funds that Linda had in her Hambuco Credit Union and Star Bank accounts.
When granting a divorce, the court must determine what "constitutes marital property and what constitutes separate property." R.C. 3105.171(B). "Marital property" includes all personal property currently owned by either or both of the spouses that was acquired by either or both of the spouses during the marriage. R.C. 3105.171(A)(3)(a)(i). It is important to note that the holding of title to property by one spouse individually or jointly, does not in and of itself determine whether the property is marital or separate. R.C. 3105.171(H). In characterizing the parties' property as separate or marital, the court shall divide and distribute the marital and separate property in an equitable manner. Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 130.
In reviewing the classification of property in divorce cases under R.C. 3105.171, this court will not reverse the trial court's findings unless they are against the manifest weight of the evidence. Johnson v. Johnson (Sept. 27, 1999), Warren App. No. CA99-01-001, unreported, at 7. The factual findings of the trial court relating to its classification of property as marital or separate are reviewed to determine whether they are supported by competent, credible evidence. Id., citing Dever v. Dever (Apr. 12, 1999), Clermont App. No. CA98-07-050, unreported; Barkley v.Barkley (1997), 119 Ohio App.3d 155. See, also, Sec. PacificNatl. Bank v. Roulette (1986), 24 Ohio St.3d 17, 20. This standard of review is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal.Barkley at 159.
"The trial court will be given wide latitude in resolving issues of fact and making factual findings, if such are supported by the record." Johnson at 7. We are guided by the presumption that the findings of facts of the trier of fact are correct, and the trial judge is best able to view the witnesses, observe their demeanor, and weigh the credibility of the proffered testimony.Wieser v. Wieser (Oct. 5, 1998), Butler App. No. CA970-12-225, unreported, at 6, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
Anthony maintains that Linda's Hambuco and Star Bank accounts should be considered marital property and, therefore, he is entitled to half of the funds. Anthony testified that Linda had a total of about $70 in these accounts at the start of the marriage, but one day prior to the complaint for divorce being filed, she had $25,383.87 in her Hambuco account and $3,193.22 in her Star Bank account.
R.C. 3105.17(A)(3)(iii) provides that "[e]xcept as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage is deemed to be marital property." Middendorf v. Middendorf (1998),82 Ohio St.3d 397, 399. However, "[i]f an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F)[3] of this section." R.C. 3105.171(C)(1); see Baker v.Baker (1992), 83 Ohio App.3d 700, 702; King v. King (1992),78 Ohio App.3d 599, 604. Our review is limited to the equity, i.e., fairness, of the property distribution in its entirety. Fergus v.Fergus, 117 Ohio App.3d 432, 437-438; Briganti v. Briganti (1984),9 Ohio St.3d 220, 222.
Based upon our review of the record, we find that these funds are marital funds, but the trial court's distribution of the funds, while not equal, is equitable. Throughout the course of the marriage, both parties maintained separate finances. Linda paid most of the expenses for the household and the children while Anthony paid the utility bills and used his discretionary income for expenses for his horses. Linda does not dispute Anthony's expenditures of his personal funds.
In addition, Anthony does not dispute that the entire amount of his separate savings accounts were determined to be his separate property by the magistrate. Nor does Anthony argue that his separate savings accounts are marital property. Anthony withdrew $5,509.59 from his Wright Patterson Credit Union account and $90.85 from his Airfreight account during the pendency of this case. Linda used her money in part to repay a loan to her mother and to cover real estate taxes ($1,886.07), homeowner's insurance ($584.80), horse care ($1,527.79), child care for two children ($3,000), dryer replacement ($286.18), and legal fees.
We find that there is competent, credible evidence that supports the trial court's factual findings that Linda was entitled to receive the proceeds from her two accounts as an equitable distribution. See Johnson, at 7. The first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN FAILING TO RECOGNIZE THE ENTIRE PREMARITAL INTEREST OF THE APPELLANT IN THE REAL ESTATE.
In his second assignment of error, Anthony argues that the trial court did not give him full credit for his premarital interest in the real estate.
"Separate property" is defined as including: "Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable. R.C. 3105.171(A)(6)(b). A spouse's separate property should be awarded to that spouse. R.C.3105.171(D). In addition, a spouse is entitled to receive reasonable compensation for the spouse's premarital interest in property. Getter v. Getter (1993), 90 Ohio App.3d 1, 8.
Anthony maintains that he is entitled to $22,440.25 as a premarital asset.[4] In addition, Anthony claims that he is entitled to the proceeds from the sale of the mobile home. The trial court found that Anthony had $9,904.29 as a premarital interest in the real estate but awarded him $4,952.15.
Having reviewed the record and Anthony's exhibits, we find that the trial court properly awarded Anthony reasonable and equitable compensation for his premarital interest. The record reflects that the trial court properly considered the statutory requirements for an equitable distribution of the marital home. Anthony purchased the property less than one year before the marriage. The $11,000 loan coincided with the payment for the real estate to pay off the land contract. During the marriage, the mortgage was released by his parents as indicated by a satisfaction of mortgage filed in the Brown County Recorder's office. Anthony subsequently sold the mobile home after four years for $2,000 and deposited the money into the joint marital account. Anthony and Linda used the property as their residence throughout their fourteen-year marriage where they raised their three children. Throughout the marriage, Linda paid one-half of mortgages and three-fourths of the mortgages during the divorce proceeding as well as other household expenses. The record indicates that Anthony did not object to the magistrate's finding that the real estate was marital property. We also find that Anthony presented evidence supporting his expenditure of $9,904.29 for improvements (driveway, septic tank, electric) to the property to make it suitable for a home.
In light of the foregoing, we find that there is competent credible evidence that the $4,952.15 premarital interest was reasonable and equitable in this case. See Johnson at 7. Anthony's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN FAILING TO RECOGNIZE THE DEBT DUE APPELLANT'S PARENTS AS A MARITAL DEBT.
In his third assignment of error, Anthony argues that the trial court abused its discretion by failing to recognize the existence of a debt incurred during the course of marriage as a marital debt. Anthony argues that the default judgment against him for $19,236.25 by his parents has not been paid, and that both parties are liable for the $11,000 he borrowed on July 25, 1980 for the real estate and for the $6,000 he borrowed from his parents while he attended school to become a jet engine mechanic.[5]
In a separate proceeding, on December 20, 1995, a default judgment was entered against Anthony and a judgment lien was placed against the marital home. Anthony testified that he did not appear at the hearing because he had no notice of the hearing although he was living with his parents. The magistrate and trial judge found that Anthony permitted his parents to take a default judgment against him in the amount of $19,936.25 as a combined effort with them to inflate his share of the marital real estate by the alleged amount and to deprive Linda of her interest in the real estate.
Records of the Brown County Recorder's Office show that on July 20, 1983, Thomas Moubray and Gladys Moubray executed a Satisfaction of Mortgage indicating that the $11,000 debt had been paid in full for the real estate and the mortgage had been released. Thomas Moubray testified at the hearing that he never signed the satisfaction of mortgage. However, he testified that his signature and his wife's signature were on the document.
The magistrate and the trial judge further found that the remaining sum was allegedly for reimbursement of money given to Anthony during an illness as a gift without Linda's consent. No evidence was presented that Linda ever participated in conversations with his parents concerning the loan. In fact, Thomas Moubray testified that "[he] never discussed anything with [Linda]." Linda testified that Anthony told her it was a gift, and that she encouraged him not to take it.
Anthony asserts that he had discussed borrowing the money with Linda, and that he had to borrow money for living expenses when he had no income for four years. Our review of the record reveals otherwise. While Anthony was on medical leave he received disability payments and two social security payments of $12,312.50 and $8,900. In addition, Linda testified that she paid most of his expenses during the time he was ill.
The trial court apparently rejected the testimony of Anthony and his father on these issues, and the trial court is in the best position to weigh the credibility of witnesses in order to resolve such factual disputes. See, e.g., Barkley,119 Ohio App.3d at 159. Because Linda's testimony and the satisfaction of the mortgage presents a competent, credible basis for the trial court's factual conclusions, we find that there is some competent, credible evidence to support the trial court's findings. Anthony's third assignment of error is overruled.
Judgment affirmed.
YOUNG, J., concurs.
VALEN, J., concurs separately.
[1] Our review of the record reveals that Linda and Anthony maintained the following accounts. The names on the accounts as of the time these divorce proceedings were initiated in May 1995 show:
 (1) National Bank Trust Savings account in the name of Anthony D. Moubray and Linda G. Moubray.
 (2) Hambuco Federal Credit Union account in the name Linda Moubray.
 (3) Star Bank account in the name of Linda G. Sanefer (Moubray).
 (4) Wright Patterson Credit Union accounts in the name of Anthony D. Moubray.
(5) Airfreight account in the name of Anthony Moubray.
(6) CAP 401K in the name of Anthony Moubray.
[2] The copy of the mortgage executed by Anthony and his parents dated July 25, 1980 indicates that it was for $11,000.
[3] R.C. 3105.171(F) states in making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:
(1) The duration of the marriage;
(2) The assets and liabilities of the spouses;
 (3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;
(4) The liquidity of the property to be distributed;
 (5) The economic desirability of retaining intact an asset or an interest in an asset;
 (6) The tax consequences of the property division upon the respective awards to be made to each spouse;
 (7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;
 (8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;
 (9) Any other factor that the court expressly finds to be relevant and equitable.
[4] In our review of the record and the supporting checks and documents submitted by Anthony, it is unclear to this court how Anthony arrived at this figure. We note that in his brief, he claims that this figure includes a $3,999 down payment on real estate, an $11,000 loan and $9,904.09 in expenditures for improvements to the land for a total of $23,903.09.
[5] Our review of the record reveals that Anthony testified that he borrowed $500 per month for eighteen months, a total of $9,000. In his brief, however, Anthony states that the amount was $6,000.